**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| (1) CITY OF SHAWNEE, OKLAHOMA, | Case No. 5:26-cv-00515-D |
| Plaintiff, | |
| v. | |
| (1) CONRAD FIRE EQUIPMENT, INC.; (2) FIRE APPARATUS MANUFACTURERS' ASSOCIATION | JURY TRIAL DEMANDED |
| Defendants. | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff, City of Shawnee, Oklahoma ("Plaintiff"), brings this action against Conrad Fire Equipment, Inc. ("Conrad"), and Fire Apparatus Manufacturers' Association (together "Defendants") for equitable and injunctive relief, as well as damages and treble damages and alleges as follows:

**INTRODUCTION**

1. Fire truck manufacturers ("Manufacturer Conspirators") manufacture and supply fire trucks and components that are sold throughout the United States and Oklahoma often in concert with an "exclusive network" of distributors such as Defendant, Conrad. Beginning in or about January 2016, Manufacturer Conspirators, in concert with Defendants and other co-conspirators, entered into an agreement, combination or conspiracy, to limit the supply, and to fix, raise, maintain, or stabilize prices of fire trucks and components sold in the United States, including Shawnee, Oklahoma, at supra-

1

competitive levels. As a result of the unlawful conduct of Defendants and co-conspirators, Plaintiff suffered substantial harm.

2.      Defendant Conrad unlawfully conspired with various related entities such as OshKosh and its leading North American brand, Pierce Manufacturing, Inc. ("Pierce"), to exclusively sell their fire trucks and replacement parts with intent to dominate the Oklahoma market.

3.      The conspirators have perpetrated their conspiracy in part through Defendant, Fire Apparatus Manufacturers' Association ("FAMA"). The Manufacturer Conspirators submit sensitive, non-public economic data to FAMA, then FAMA sends the data to an outside consulting company that compiles the data into reports that FAMA then distributes to its members. FAMA also provides a forum for Manufacturer Conspirators to communicate with each other directly during yearly members-only meetings.

4.      Plaintiff brings this action under the Oklahoma Antitrust Reform Act, 79 O.S. § 201, *et seq.*, and the common law equitable principles, and asserts the following allegations on information and belief, except as to those paragraphs that pertain to Plaintiff, which are based upon personal knowledge.

**PARTIES**

**I.      Plaintiff**

5.      The City of Shawnee is located in central Oklahoma and serves as the county seat of Pottawatomie County. Shawnee has a population of approximately 31,000 residents and serves as a regional hub for commerce, education, healthcare, and industry in the surrounding area. Additionally, Shawnee is home to Oklahoma Baptist University and

other educational institutions that contribute to a dynamic and fluctuating population base

Uniquely, Shawnee is tasked with fire protection for the sovereign territories of several

Native American Tribes.



6.      Shawnee includes residential neighborhoods, commercial districts, light

industrial facilities, educational institutions, healthcare facilities, and major transportation

corridors. These characteristics create diverse fire protection and emergency response

challenges requiring a full-service municipal fire department capable of providing fire

suppression, emergency medical services, rescue operations, hazardous materials response,

and fire prevention services across varied occupancies and terrain.

## II.    DEFENDANTS

### A.    Conrad Fire Equipment, Inc.

7.    Conrad Fire Equipment, Inc. ("Conrad") is incorporated in and headquartered in Kansas and operates two service centers within the State of Oklahoma, in concert with OshKosh and Pierce.

### B.    The Fire Apparatus Manufacturers' Association

8.    The Fire Apparatus Manufacturers' Association ("FAMA") is a not-for-profit trade association for fire apparatus manufacturers, located in Greenwell Springs, Louisiana.

9.    FAMA acted as a co-conspirator by facilitating the exchange of confidential, proprietary, and competitively sensitive data among the other Conspirators.

### C.    Unnamed Dealer Co-Conspirators

10.    Manufacturer Conspirators sell fire trucks and components through a series of exclusive dealers such as Conrad.

11.    Manufacturer Conspirators' exclusive dealers have largely eliminated geographic overlaps which give manufacturer-specific dealers exclusive control over vast territories.

12.    Manufacturer Conspirators' exclusive dealer programs have resulted in reduced competition.

13.    Although not individually named as parties to this Complaint, additional Manufacturer Conspirators' dealers have enabled, abetted, and facilitated the conspiracy

4

alleged herein.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) as Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds $75,000.

15.     This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States and Oklahoma, including in this District; (b) Defendants had substantial contacts within the United States and Oklahoma, including in this District; and/or (c) Defendants engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States and Oklahoma, including in this District.

16.     Defendants' activities were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the commerce of the State of Oklahoma.

17.     Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because multiple Conspirators and Defendant Conrad resided or transacted business in this District, are licensed to do business or are doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

## FACTUAL BACKGROUND

### A.  The Fire Truck Industry Previously Consisted of Many Independent Sellers.

18.    The modern fire truck manufacturing industry boomed in the post-war decades of the 1950s and 1960s.[1] Small and midsized fire truck manufacturers—typically family-owned operations—appeared in every region of the country to produce emergency vehicles tailored to the needs of local fire departments. The industry was competitively diversified across at least two dozen companies. Competition among these smaller firms kept fire truck prices near costs, and the existence of a large number of manufacturers ensured redundant manufacturing capacity to meet demand.[2] By 2008, these companies sold over 5,000 new fire trucks in the United States every year.

19.    For decades, the fire truck industry enjoyed relatively stable (inflation-adjusted) prices and ample production capacity. With few exceptions, the annual cost increase for new trucks prior to 2008 was around 3%.[3]

20.    In 2011, the market for new fire truck sales had fallen more than 40% from its peak,[4] from 5,000 a year to around 3,000 a year.[5] Many independent fire truck manufacturers folded during this period. Demand for fire trucks did not fully rebound until

---

[1] Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, BIG BY MATT STOLLER (Jan. 25, 2025), https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll  (last visited Aug. 15, 2025) (hereinafter "Musharbash")..
[2] *Id.*
[3] *Id.*
[4] Paul C. Darley, *The Fire Apparatus Market is Coming Back... Just Look at the Data*, FAMA.ORG (Dec. 5, 2015), https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data/ (last visited Aug. 15, 2025).
[5] Musharbash, *supra* note 1.

the mid-2010s.

### B. Three Fire Truck Manufacturers Now Control the Majority of the Market in this Field.

21.    Fire truck manufacturers— Oshkosh Corporation ("Oshkosh"), REV Group, Inc. ("REV Group"), Rosenbauer America LLC ("Rosenbauer") ("Manufacturer Conspirators"), acting in concert with co-conspirators including Defendants, are responsible for increasing fire truck prices and perpetuating lengthy backlogs. Together, these three manufacturers control between 70 and 80 percent of the U.S. fire truck market, and they have unlawfully conspired to use their collective market power to suppress the fire truck supply and raise prices.

22.    This conspiracy is perpetrated through exclusive dealership agreements between Manufacturer Conspirators and their exclusive dealers such as Defendant Conrad, which sell fire trucks and components at artificially inflated prices to customers, including Plaintiff.

23.    Fire truck prices have doubled in the last ten years. A fire truck that cost $500,000 in the mid-2010s now costs $1 million. More specialized trucks that used to cost $900,000 now cost more than $2 million. Inflation alone does not explain these price increases, which have squeezed municipal budgets and prevented communities from replacing their old rigs. At the same time, wait-times for new fire trucks have ballooned from 18 months in the mid-2010s to more than four years today.

24.    As a result of high prices and long order backlogs, fire trucks that should have been retired after 15 or 20 years are now celebrating their 30th "birthdays" on the front

lines. These older trucks break down more frequently and are more difficult to repair than new trucks, leaving gaps in communities' fire protection systems and putting the public in danger. These gaps can have deadly consequences when fires breakout and no fire trucks are available to respond. Even communities that have been able to purchase new Fire Trucks have had to redirect funds from other priorities to cover the price increases.

### C. Conspiracy between Manufacturer Conspirators and their Distributors

25.    In 2021, Oshkosh's primary North American subsidiary, Pierce, announced that it had acquired Boise Mobile Equipment ("BME").[6] BME's product portfolio, which allowed Pierce to expand its reach and focus to West Coast markets, included fire apparatus like the Model 34, Tactical Tender, and Type 6 Xtreme.[7] In 2022, Oshkosh acquired Maxi-Metal, Inc.,[8] a leading designer and manufacturer of custom fire trucks. After these expansions, Oshkosh controlled a full quarter of the U.S. fire truck market.

---

[6] *Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment*, OSHKOSHCORP.COM (Sept. 16, 2021), https://https://www.investors.oshkoshcorp.com/news/pierce- manufacturing-completes-ownershipinterest- in-boise-mobile-equipment/16c54803-9007-4e9e-82f2-e6253396d4e0/ (last visited Aug. 15, 2025).
[7] *Pierce Completes Ownership Interest in BME*, FIREHOUSE.COM (Sept. 16, 2021), https://www.firehouse.com/apparatus/press-release/21238596/pierce-manufacturing-custom-fire-truck-builder-pumpers-ladders-quints-rescues-puc-enforcer-pierce-completes-ownership-interest-in-bme (last visited Aug. 15, 2025); *Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment*, PIERCEMFG.COM (Sept. 16, 2021), https://www.piercemfg .com/pierce/press-release/pierce-manufacturing-completes-ownership-interest-in-boise-mobile-equipment (last visited Aug. 15, 2025).
[8] *Oshkosh Corporation Acquires    Maxi-Metal, Inc.*, OSHKOSHCORP.COM (Jun.13, 2022), https://www.investors.oshkoshcorp.com/news/oshkosh-corporation-acquires-maxi-metal-inc/c5afbb77-38ec-4497-a391-f4f56b88d127/ (last visited Aug. 15, 2025).

26.    In 2016, Mike Schoenberger, Pierce's vice president of marketing and sales, expounded on Oshkosh and Pierce's acquisitions strategy in an interview with a trade publication. The article stated:

> Because Oshkosh Truck successfully diversified its own business through acquisitions, these will play a role in Pierce Manufacturing's growth going forward. Schoenberger stated, "Part of our growth here at Pierce is organic, but *part of our strategy going forward is acquisitions*." The targets will be those companies that can add to Pierce Manufacturing's current orientation.

*On Fire*, Industry Today, Vol. 4, Issue 6 (July 26, 2016) (emphasis added).

27.    In addition to purchasing third-party manufacturers, Oshkosh also embarked on a strategy of consolidating the U.S. brands already within its purview, reducing geographic overlap between its dealers. In July 2018, Pierce subsidiary MacQueen Emergency Group ("MacQueen") acquired Schuhmacher Fire Equipment. The acquisition consolidated MacQueen's control over the upper Midwest, including Minnesota, Nebraska, South Dakota, North Dakota, and 109 Missouri counties, leaving Western Missouri, Kansas, and Oklahoma to be controlled by Conrad.[9]

28.    In January 2019, Pierce dealer Siddons-Martin Emergency Group ("Siddons") acquired Superior Equipment, consolidating control over the American Southwest.[10] Siddons' territory now includes Texas, Louisiana, New Mexico, Utah, and

---

[9] *MacQueen Emergency Group Territory Expanded to Include 109 Missouri Counties*, PIERCEMFG.COM (July 10, 2018), https://www.piercemfg.com/pierce/press-release/macqueen-emergency-group-territory-expanded-to-include-109-missouri-counties (last visited Aug. 15, 2025).
[10] *Siddons-Martin Emergency Group Expands Territory with Acquisition of Superior*

Nevada.

29.    In November 2019, Pierce dealer Allegiance Fire and Rescue ("Allegiance") acquired Minuteman Fire and Rescue. The acquisition expanded Allegiance's territory to encompass most of New England, including Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.[11]

30.    In September 2023, Pierce dealer Firematic Supply Co. Inc. ("Firematic") acquired Churchville Fire Equipment. The acquisition consolidated Firematic's control over Connecticut and New York.[12]

31.    Most recently, on June 12, 2025, Pierce dealer Reliant Fire Apparatus brand ("Reliant") acquired Halt Fire, Inc., thereby consolidating Reliant's "exclusive Pierce territory" to include Michigan, in addition to its existing territories in Wisconsin and Iowa.[13] Pierce noted that Reliant would "align Michigan operations with its existing

---

*Equipment*, PIERCEMFG.COM (Jan. 21, 2020), https://www.piercemfg.com/pierce/press-release/siddons-martin-emergency-group-expands-territory-with-acquisition-of-superior-equipment (last visited Aug. 15, 2025).

[11] *Minuteman Fire and Rescue Acquire by Allegiance Fire and Rescue*, ALLEGIANCEFR.COM (Nov. 19, 2019), https://allegiancefr.com/minuteman-fire-and-rescue-acquired-by-allegiance-fire-and-rescue/ (last visited Aug. 15, 2025).

[12] Pierce Dealer Firematic Supply Co. Grows Presence in Northeast with Acquisition of Churchville Fire Equipment, PIERCEMFG.COM (Sept. 1, 20123), https://www.piercemfg.com/ pierce/press- release/pierce-dealer-firematic-supply-co.-grows-presence-in-northeast-with-acquisition-of-churchville- fire-equipment (last visited Aug. 15, 2025).

[13] *Reliant Fire Apparatus Acquires Halt Fire, Inc. Expands Pierce Dealership Territory to Include the State of Michigan*, PIERCEMFG.COM (Jun 12, 2025), https://https://www.piercemfg.com/ pierce/press-release/reliant- fire-apparatus-acquires-halt-fire-inc.-expands-pierce-dealership-territory-to-include-the-state-of-michiganisited Aug. 15, 2025).

territories" to "ensur[e] a consistent and reliable customer experience."[14]

32.    These consolidations, which have largely eliminated geographic overlaps and given Pierce dealers exclusive control across vast territories, have reduced or eliminated competition among Pierce subsidiaries.

**D.  The Role of Conrad As The Exclusive Pierce Distributor**

33.    Conrad acting as "the exclusive Pierce Fire apparatus and parts dealer in Oklahoma, Kansas, and Western Missouri," conspired with various parties, most notably, OshKosh and its leading North American brand, Pierce Manufacturing, Inc. ("Pierce") and played a prominent role in dominating the Oklahoma market.

34.    Pierce enforces a strict agreement with its Conrad in which, for a wide variety of parts for Pierce apparatuses, Conrad agrees not to sell customers parts that are fully compatible with and operable in Pierce apparatuses, other than Pierce proprietary parts sold by Pierce.

35.    Pierce and Conrad also enforce restrictive clauses in customer warranty agreements under which customers may void their warranty if they replace a part in a Pierce apparatus with a non-Pierce proprietary part.  Further, replacements are made by "Pierce Certified" technicians.

36.    Pierce also intentionally designs its apparatuses so that only parts manufactured by Oshkosh can be used to replace original parts. This arrangement unlawfully stifles competition in the Oklahoma market and allows the Conspirators to reap

---

[14] *Id.*

exorbitant profits in the replacement parts business from customers who, absent this conduct, could have gotten the parts they needed at a lower price from a competing parts manufacturer or distributor.

37.     In a competitive marketplace, firms could not impose such restraints on customer choice and would expand their productive capacity to increase output and meet increased or pent-up demand, keeping prices at a competitive equilibrium. But the Oklahoma market for fire apparatuses, chassis, and fire truck replacement parts are no longer competitive. The market is dominated by powerful behemoths. The conspirators bought their way to dominance, and they are now in full extraction mode, deliberately suppressing output, withholding supply, delaying deliveries, restricting competitive options, and charging supracompetitive prices without consequence.

38.     Acquisitions of a custom Pierce truck often start with the Build My Pierce® (BMP®) with step one being directed by Pierce's website to contact Conrad.  To make matters worse, Conrad's unlawful conduct in restricting the Oklahoma market for Pierce trucks and their parts to certain manufacturers, has enabled other competitors to follow suit, using Conrad's higher prices as an opportunity to raise prices themselves, knowing that Oklahoma fire departments have nowhere else to turn.

39.     The apparatus price increases OshKosh and Pierce have imposed in conspiracy with Conrad, has enabled their limited competitors and co-conspirators to impose, far exceed any reasonable measure of inflation and—despite Conspirators' best efforts at subterfuge—cannot be explained away by COVID supply chain issues.

12

40. There is abundant direct evidence that Conrad, Pierce and OshKosh, working in tandem with each other, are able to exercise the market power they unlawfully acquired through their schemes— namely, evidence that OshKosh, Pierce and Conrad have increased prices substantially and reduced supply well beyond what inflation, COVID supply shortages, and other factors can explain; reduced quality, variety, and customer choice; and otherwise systematically worsened terms. OshKosh, Pierce and Conrad are able to charge more on a sustained basis, precisely because their anticompetitive schemes acting in concert with fellow co-conspirators have eliminated meaningful competitive constraints. Each set of OshKosh, Pierce and Conrad's price increases and other worsening of terms have also directly enabled other co-conspirators to raise prices and worsen terms to customers—

///

///

///

an umbrella price effect market-wide for which each Defendant is responsible. Evidence

of their continued collaboration is currently demonstrated online.[15]



*Screenshot from press release recently published on Piercemfg.com.*

  **E.**  **FAMA facilitates Manufacturer Conspirators' exchange of confidential**

**information**

  41.  As of May 2025, FAMA had limited manufacturer members, including REV

Group brands E-One, Ferrara, KME, and Spartan; Oshkosh brand Pierce; and Rosenbauer.

---

[15] https://www.piercemfg.com/customers/new-deliveries/oklahoma-city-fire-department-pumper-43376

14

42.    John Schultz, the Vice President and General Manager of Pumper Products at Pierce,[16] is FAMA's vice-chair.[17]

43.    Additionally, Manufacturer Conspirators have perpetrated their conspiracy in part through Defendant, FAMA. The Manufacturer Conspirators submit sensitive, non-public economic data to FAMA, then FAMA sends the data to an outside consulting company that compiles the data into reports that FAMA then distributes to its members. FAMA also provides a forum for Manufacturer Conspirators to communicate with each other directly during yearly members-only meetings.

44.    FAMA is at the center of the conspiracy. The economic data Manufacturer Conspirators obtain from FAMA is not the type of information that competitors would provide each other in a normal, competitive market. The Manufacturer Conspirators use the sensitive economic data FAMA shares with them to coordinate price increases and suppress production. They also use FAMA to monitor their co-conspirators to ensure continued adherence to the conspiracy.

45.    None of the FAMA reports are available to anyone other than the manufacturers themselves. As a result, buyers in the market, including Plaintiff, operate at a disadvantage. By restricting data access, FAMA reports create an information asymmetry that benefits the Manufacturer Conspirators, and their distributors, such as Conrad, at

---

[16] *John Schultz*, PIERCEMFG.COM, https://www.piercemfg.com/hubfs/FDIC%202025/Bios/Bio/John%20Schultz%20-%20Pierce%20Manufacturing.pdf (last visited Aug. 15, 2025).

[17] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://https://www.fama.org/data-research-committee (last visited Aug. 15, 2025).

buyers' expense. This information exchange is particularly likely to have anticompetitive effects because so few sellers control the fire truck market.

46.    All three Manufacturer Conspirators are members of FAMA.[18] FAMA colludes with the Manufacturer Conspirators to enable an information exchange through statistical reports and by organizing twice-yearly in-person meetings.

### 1.    FAMA Statistical Reports

47.    FAMA describes access to competitors' data as "one of the most valuable reasons" for companies to join the organization. FAMA has an entire committee, the Data & Research Committee, dedicated to enabling this data exchange. FAMA describes the Data & Research Committee's mission as helping to "strengthen FAMA member companies by providing actionable data," including economic data, "for strategic business planning."[19] The Committee is tasked with "collect[ing] and distribut[ing] data regarding apparatus sales and orders" and distributing it on at least a quarterly basis.[20] FAMA describes this "detailed data"[21] as "invaluable" to members "for their internal business purposes."[22]

---

[18] Members List, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/members/list (last visited Aug. 15, 2025).
[19] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://https://www.fama.org/data-research-committee (last visited Sept. 14, 2025).
[20] *Id.*
[21] Paul C. Darley, *The Fire Apparatus Market is Coming Back... Just Look at the Data*, FIRE APPARATUS MFRS. ASS'N (Dec. 4, 2015), https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data (last visited Aug. 15, 2025).
[22] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join (last visited Aug. 15, 2025).

48.    The Data & Research Committee maintains a digital data portal through which apparatus manufacturers enter economic data. That data is sent to an accounting firm, which compiles the data and returns it to the Data & Research Committee. The Committee then uploads the data onto the FAMA website.

49.    Not just anyone can access this data, however. "FAMA does not release this information to the public."[23] Instead, the data is uploaded onto a secure portion of the FAMA website that FAMA describes as a "members-only section."[24] "Only those companies that participate in the statistical studies and members are privy to these reports."[25]

50.    FAMA imposes strict limits on who can become a member, and consequently, who has access to these reports. To join FAMA, an entity must (a) be "engaged in the manufacture of firefighting or fire protection apparatus, including rescue vehicles," or (b) "manufacture components or products which are incorporated by the manufacturer as a permanent part of the completed fire apparatus . . . such as chassis, fire pumps, fire hoses, hose reels, ladders, aerial devices, apparatus valves and other water control appliances."[26] Notably, fire departments, municipalities, and other

---

[23] Id.

[24] FIRE APPARATUS MFRS. ASS'N, WHY JOIN FAMA, https://www.fama.org/wp-content/ uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf (last visited Aug. 15, 2025).

[25] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join; https://www. fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data (last visited Aug. 15, 2025).

[26] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join (last visited Aug. 15, 2025).

buyers of fire apparatus are not eligible to join FAMA under this definition. Such entities—apparatus manufacturers' customers—are denied access to the data that manufacturers exchange among themselves.

51.    Even among its members, FAMA further restricts data access to those companies that provide their own data, in a give-data-to-get-data scheme. FAMA states data access "may be denied" to any company "that was given the opportunity to participate in the program but refused."[27] Data may also be denied to any company "that does not agree in advance of participation to keep the results confidential."[28]



**INDUSTRY STATISTICS**

FAMA is the ONLY source for accurate fire service statistics provided quarterly and summarized at year end. Only FAMA members are privy to these reports since they are not released to the public. Members find this research invaluable  for their internal business purposes regarding apparatus purchases by state, product category, pump type and more.

*Section of a flyer titled "Why Join FAMA?"[29]*

### 2.    FAMA Meetings

52.    In addition to providing economic data to their members, FAMA also organizes twice-yearly meetings, in the spring and the fall, to "provide a forum [for

---

[27] *Data & Research Committee*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/data-research- committee (last visited Aug. 15, 2025).
[28] *Id.*
[29] FIRE APPARATUS MFRS. ASS'N, WHY JOIN FAMA, https://www.fama.org/wp-content/ uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf (last visited Aug. 15, 2025).

members] to share information."[30]

53.     At these meetings, attendees, including direct competitors, listen to presentations that include economic forecasts regarding the Fire Truck manufacturing market.

54.     Attendees also engage in "purchasing roundtables" and FAMA members-only meetings and discussion groups.

55.     FAMA meetings provided Manufacturer Conspirators an avenue to exchange sensitive commercial information and coordinate supply restrictions and price hikes at these meetings. FAMA advertises these "networking" events as one of the reasons to join FAMA.



**NETWORKING**

FAMA's spring and fall meetings provide a great opportunity to network with industry professionals. The meetings also keep members up-to-date with new information, allow for group formulations of organizational goals and provide a forum to share information.

*Section of a flyer titled "Why Join FAMA?"[31]*

56.     In addition to the statistical reports and twice-yearly in-person meetings, FAMA "communicates with its members on a regular basis via emails, its website and an

---

[30] *Why Join?*, FIRE APPARATUS MFRS. ASS'N, https://www.fama.org/why-join (last visited Aug. 15, 2025).

[31] Fire Apparatus Mfrs. Ass'n,    *FAMA Membership Meetings*, YOUTUBE.COM (Feb. 26, 2016), https://www.youtube.com/watch?v=dbdjUvqfFAw (last visited Aug. 15, 2025).

extensive FAMA newsletter."[32] These private communications offered another avenue for communication and coordination among Manufacturer Conspirators.

### 3.    Information Exchanges at FAMA Meetings

#### a.    FAMA Member Meetings 2016-2024

57.    At FAMA's October 2016 meeting in Nashville, Tennessee, the Statistics Committee demonstrated how the statistics website worked, highlighting certain analytical features.

58.    At the March 2017 meeting in St. Pete Beach, Florida, the Board of Directors reported that one of its key initiatives was to "[d]evelop a five-year fire apparatus industry forecast for use with the statistical data."

59.    At the same meeting, the Statistics Committee reported on "2016 total fire apparatus sales *broken down by product type*, total sales booked 4,214 and shipped 4,707." The Committee also noted that "the data analysis tool has been improved for more specific category selections"—i.e., to allow for more granular searching.

60.    In October 2017, the Statistics Committee presented "a 12-month rolling report of total apparatus sales with a *break down by product types*." The Board also reported at this meeting that "Sage Policy Group" had been retained by FAMA "to develop a forecast report." The Statistics Committee presented slides, but they were not included with the minutes.

---

[32] *Id.*

61.     FAMA met again in February 2018 in Coronado, California. At this meeting, the Board of Directors stated that it would "provide additional analysis of the FAMA statistical data via the Sage Policy Group Industry Report."

62.     The Statistics Committee reported sales results for several time periods and "provided a break-down of sales by product type."

63.     The Statistics Committee also "encourage[ed] members to post their data within 30-days of quarter close." The Statistics Committee presented slides, but they were not included with the minutes.

64.     In October 2019 in Toronto, Ontario, the FAMA Board of Directors reported that its goals included "continu[ing] to evaluate value of The Sage Report" and to "[d]evelop an 'Executive Summary' (single page) that can be used to disseminate data."

65.     The Statistics Committee presented data about fire apparatus orders from 2002 through 2019 YTD, rolling 12-month reports, and a data set "provided by product type."

66.     In early 2022, after the COVID outbreak, FAMA resumed in person meetings, with one being held in St. Pete Beach, Florida. The Board of Directors conducted an extensive discussion concerning the future of FAMA. According to the Board of Directors, the FAMA's mission states, "[w]e are here to maximize profits of FAMA member companies."

67.     The Board of Directors stated that the "primary reasons and key deliverables of FAMA are Statistics, Technical Committee, GAC [Government Affairs Committee], and Networking Opportunities."

68.    During its presentation, the Statistics Committee reported that there were 5,586 units booked, a 46.1% increase from 2020. It continued to note that three product categories represent 91% of the market (pumpers at 65%; aerials at 14%; and tankers at 13%). Then the Statistics Committee provided a detailed sales analysis for each product type.

69.    The Statistics Committee also conducted a poll. Over 75% of the respondents said the Statistics Committee data was valuable at a rate of 8 or higher on a scale of 1-10 (with 10 being the most valuable). Similarly, over half the respondents indicated that the statistics data was "actionable."

70.    In March 2023, FAMA met again in Fort Lauderdale, Florida. The Statistics Committee again encouraged members to submit data in a timely fashion as well as broader participation in data sharing. With charts and graphs (again, not attached to the minutes) the Committee also provided detailed bookings and orders for each product type.

71.    FAMA met again in February 2024 in St. Pete Beach, Florida. During its report, the Board of Directors reiterated that its "mission is to continue to provide industry-based value that maximizes the growth and profits of FAMA members companies." One way of accomplishing that is to "[c]reate and distribute pertinent information to members and end-users." Again, statistics was a key focus area for the Board.

72.    At the same February 2024 meeting, the newly minted Data & Research Committee also provided its report, again providing precise, granular information about bookings and shipping for each primary product type.

### b.    FAMA's 2021 Virtual Fall Meeting

73.    Although slides were not attached to the minutes of the meetings outlined above, the presentation slides for FAMA's 2021 Virtual Fall Meeting are available.

74.    During that meeting, the Board announced an Apparatus Replacement Project Overview. The Overview was designed to be a survey of FAMA's customer base to data mine "for info primarily on fleet age, replacement cycles, down time, maintenance/ownership costs, etc." A goal of the project was to "[c]reat[e] the data set to pull from to grow our market . . ." The Overview would obtain "high level overviews" but also "granular data" on apparatus types, department types, etc.

75.    In 2021, there were six members of the Statistics Committee. Two of them (including the co-chair, John Schultz) worked at Pierce Manufacturing. Another worked at Rosenbauer America, LLC. Thus, half of the Committee worked at Manufacturer Conspirators.

76.    The initiatives for the Statistics Committee included continuing to publish quarterly data and increasing participation of members reporting.

77.    Like other reports, the slides broke down sales data for each product type. For aerials, the slides distinguished between six different types of aerials and provided the precise quantity of sales for each type.

78.    For pumpers, the slides broke down sales for five different types of pumpers (and further distinguished them by gallons per minutes quantity), and also provided precise sales quantities for each type.

79.    The same held true for tankers—the slides distinguished between elliptical and rectangular tankers with precise data for each.

80.    Thus, FAMA regularly provided detailed, granular reports about bookings and shipping quantities for each of the primary product types.

### 4.    FAMA Governance

81.    Aside from providing detailed industry information, there also is significant overlap between leaders of FAMA and executives with Conspirators or their subsidiaries.

82.    For example, Gary Pacilio was the president of FAMA for two consecutive years: 2023 and 2024. Prior to that, he was the treasurer of FAMA for the three previous years (2020 to 2022).  During that same time span, he was also a senior executive with Spartan Fire Chassis, REV Group, and E-ONE—all entities within the REV Group corporate family.

83.    Even today, Pacilio remains on the FAMA Board of Directors in the past president position.

84.    REV Group's influence over FAMA wasn't limited to Pacilio. Bert McCutcheon was the President and CEO of FAMA in 2020 and 2022. Again, during that same time period, he was a senior executive with Ferrara Fire Apparatus and the REV Group—both entities within the REV Group corporate family.

85.    Thus, for four of the last six years, the president of FAMA has been a senior executive with some entity within the REV Group corporate family.

24

86.    The overlap is not limited to the REV Group. John Slawson served for two years as a FAMA Director immediately before he became the CEO of Rombauer in October 2019.

87.    Other examples (including Capilio and McCutcheon) are listed below:

| Executive | Fire Apparatus Manufacturers' Association Leadership Position (Year) | Affiliation(s) with Manufacturing Conspirators / Subsidiaries |
|---|---|---|
| Phil Gerace | Past President (2016) | E-ONE (July 2023-June 2024) REV Group (June 2024-present) |
| Mike Schoenberger | Director at Large (2016) Director at Large (2017) | Pierce (30 years) Rosenbauer (May 2010-present) |
| John Slawson | Director at Large (2017) Director at Large (2018) | OshKosh (2004-2009) Rosenbauer (Oct. 2019-June 2022) |
| Michael Moore | Director at Large (2018) | Pierce Mfg. (1999-May 2018) OshKosh (May 2018-present) |
| Jeromie Johnston | Director (2019) | Pierce Mfg. (Aug. 2013-July 2021) |
| Gary Pacilio | Treasurer (2020) Treasurer (2021) Treasurer (2022) President (2023) President (2024) Past President (2025) | Spartan Fire Chassis (Apr. 2021-Aug. 2021) REV Group (Sept. 2020-Dec. 2021) E-ONE (Nov. 2021-Feb. 2024) |

25

| Executive | Fire Apparatus Manufacturers' Association Leadership Position (Year) | Affiliation(s) with Manufacturing Conspirators / Subsidiaries |
|---|---|---|
| Bert McCutcheon | President and CEO (2020) Director (2021) President and CEO (2022) Past President (2023) Past President (2024) | Ferrara Fire Apparatus (1998-2022) REV Group (Jan. 2022-Nov. 2022) |

**F.    The Conspiracy Enabled Conspirators and Defendant Conrad to Raise Prices of Fire Trucks.**

**1.    Fire truck backlogs soared by 40% or more during the relevant period.**

88.    Demand for fire trucks increased steadily from 2010 until approximately 2020. Between 2020 and 2022, the number of fire truck orders spiked. Since about 2022, order activity has been between 5,500 and 6,500 trucks per year.

89.    Manufacturer Conspirators' production has not kept pace with the increased demand. Particularly within the last few years, order backlogs substantially increased. For example, REV Group reported a record $3.6 billion backlog in late 2023, a 41% increase over 2022.[33] REV Group's backlog increased again in 2024. As of last October, REV Group had a $4.4 billion backlog on fire and emergency vehicle orders in the United States.[34]

---

[33] Reuters, *Fire Truck Boom Highlights Divide in US Manufacturing*, U.S. NEWS (Jan. 19, 2024), https://money.usnews.com/investing/news/articles/2024-01-19/fire-truck-boom-highlights-divide-in-us-manufacturing (last visited Aug. 15, 2025).
[34] Rev Group, Inc. SEC Form 10K (Oct. 31, 2024), https://www.sec.gov/Archives/edgar/data/1687221/000095017024135208/revg-20241031.htm (last visited Aug. 15, 2025).

90.    Oshkosh and Rosenbauer have reported similarly mammoth backlogs. Oshkosh's backlog of fire truck orders quadrupled from 2019 to 2023; it recently reported some $4 billion in orders placed but not fulfilled.[35] And Rosenbauer announced an approximately $2.67 billion backlog at the end of 2024.[36]

91.    Increased backlogs have translated to substantial delays prior to delivery of new fire trucks. Wait times in some areas have more than quadrupled, from one year to 4.5 years.[37] An individual going by the username "Capttomo" complained in an online forum in January 2023 that "lead times for delivery from date the order is placed to final inspection has gone from 10-12 months to greater than 2 years in many cases and in some cases approaching 3 years."[38] Another user noted that a REV Group dealer "added 15 months to the delivery time" for a fire truck.[39] A third reported an estimated delivery time of 48

---

[35] Mike Baker, Maureen Farrell & Serge F. Kovaleski, *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. TIMES (Feb. 17, 2025), https://www.nytimes.com/ 2025/02/17/us/fire- engines-shortage-private-equity.html (last visited March 1, 2026)

[36] Christian Sandherr, *Rosenbauer International AG: Solid Start Into the Year/ Record High Order Backlog*, NUWAYS (May 14, 2025), https://www.nuways-ag.com/company/rosenbauer-international- ag/research/solid-start-into-the-year-record-high-order-backlog ("Q1 sales grew by 16.8% yoy to € 264m (eNuW: € 265m) thanks to the company's strong order backlog of € 2.28bn at the end of FY24.") (last visited Aug. 15, 2025).

[37] Letter from American Economic Liberties Project and International Association of Fire Fighters to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson at 2 (May 13, 2025), https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf (last visited Aug. 15, 2025).

[38] *Id.*
[39] *Id.*

27

months from a Pierce dealer for "a very cookie cutter" truck "without any interior customization."[40] And yet another described a 435 day waiting period for a single component of a Rosenbauer truck, with full wait times up to 3 years.[41]



*Forum comment by Capttomo regarding state of the Fire Truck industry.[42]*



*Forum comment by Sfdc111 regarding state of the Fire Truck industry.[43]*



*Forum comment by CFDMarshal regarding state of the Fire Truck industry.[44]*

92.    As another example, Sue Finkam, the mayor of Carmel, Indiana, said her city was growing and needed to add more fire stations. But as matters stand now, the city expects

---

[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*

to be able to acquire land, design a fire station, construct the building, hire firefighters and train them, while still waiting for the station's fire engines to be delivered.[45]

93.    The data bears out these anecdotes. While orders spiked to 45% above average levels, order fulfillment dropped nearly 10% below average levels in 2022, as illustrated in the graph below.



*North America Fire Apparatus Trend.*[46]

94.    While the rate of order fulfillment has ticked up again in recent years, that increase has not been nearly enough to address the serious backlog.

---

[45] Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. TIMES (Apr. 15, 2025), https://www.nytimes.com/2025/04/15/us/private-equity-fire-trucks-congress-investigation.html (last visited Aug. 15, 2025).
[46] *FAMA Releases Fire Apparatus Industry Update*, FIRE ENGINEERING (May 30, 2025), https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update (last visited Aug. 15, 2025).

95.    In addition to delays for new fire trucks, delays have also increased for replacement part orders. Gil Carpenter, a fire chief in Benton, Arkansas, explained that prior to REV Group rolling up Ferrara, he would call a contact named Charlie whenever he needed a Ferrara replacement part. Charlie would ship him the part the next day. But in 2024, when one of the department's vehicles needed new parts, delivery was delayed for more than 10 months. Mr. Carpenter's fire department was left without one of its eight trucks for nearly a year.[47]

96.    These backlogs cannot be explained by supply chain disruptions.



*Global Supply Chain Pressure Index from June 30, 2017, to June 30, 2025.[48]*

---

[47] Baker, Farrell & Kovaleski, *supra* note 34; *see also* Fire Apparatus & Emergency Equipment Staff, *REV Group Fire Division Launches New E-Commerce Website for Fire Truck Aftermarket Parts Sales and Service*, FIRE APPARATUS & EMERGENCY EQUIPMENT (July 29, 2019), https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-fire-division-launches-new- ecommerce-website-for-fire-truck-aftermarket-parts-sales-and-se (last visited Aug. 15, 2025).

[48] *Global Supply Chain Pressure Index (GSCPI)* , FED. RESERVE BANK OF N.Y. (July 2025), https://www.newyorkfed.org/research/policy/gscpi - /interactive (last visited Aug. 15, 2025).

### 2.    In the Face of Increasing Demand, Conspirators have Suppressed the Supply of Fire Trucks and Components.

97.    Under typical market conditions, such a significant surge in demand would be met with a corresponding increase in manufacturing capacity. But no such manufacturing capacity increase has materialized. REV Group has recently spent only a small portion of its revenue—about 1 percent—on upgrading its buildings and equipment. Alexander Yaggy, a former investor in REV Group's stock, called this minimal investment in the face of significant industry backlogs "reflective of an uncompetitive market."[49] And neither Oshkosh nor Rosenbauer have attempted to meet this surge in demand or capture market share by ramping up their production.

98.    Not only have Manufacturer Conspirators failed to add manufacturing capacity, in some cases they have in fact shuttered existing plants. In September of 2021, REV Group shut down two KME custom Fire Truck manufacturing facilities in Pennsylvania and Virginia.[50] The closure cut the company's manufacturing footprint by roughly one third.[51]

99.    Despite these record-setting backlogs, the Manufacturer Conspirators appear unconcerned that their customers might cancel orders or that a competitor might steal their business.[52] Mark Skonieczny, REV Group's current chief executive, explained during a

---

[49] Baker, Farrell & Kovaleski, *supra* note 34.
[50] Chris Reber, *KME Plant to Close in April 2022*, TIMES NEWS ONLINE, (Sept. 11, 2021), https://www.tnonline.com/20210911/kme-plant-to-close-in-april-2022(last visited Aug. 15, 2025).
[51] Baker, Farrell & Kovaleski, *supra* note 34.
[52] Musharbash, *supra* note 1.

2023 conference call that the company did not expect the delays to cause cancellations because once a city sets aside the money, it is "earmarked" and REV Group gets a deposit. "That money is allocated to those units, so we feel good about that."[53] Skonieczny further commented, "I don't think it's impacting our market share."[54] According to REV Group's SEC reports, the company considers its backlog to enhance its value to shareholders by giving the company "strong visibility into future net sales."[55]

### 3. The Price of Fire Trucks Doubled During the Relevant Period.

100. Unsurprisingly, given growing demand and flat or declining supply, the cost of Fire Trucks has soared. In the mid-2010s, a standard pumper truck cost approximately $300,000 to $500,000.[56] Within the last few years, prices have increased to an average of $1 million per pumper truck.[57] Similarly, ladder trucks that cost $750,000 to $900,000 in the mid-2010s cost upward of $2 million today.[58] An industry leader commented that the

---

[53] Baker, Farrell & Kovaleski, *supra* note 34.

[54] Eman Abu-Khaled, *REV Group Takes Steps to Normalcy After Supply-Chain Setbacks*, TRAILER BODY BUILDERS (Mar. 22, 2023), https://www.trailer-bodybuilders.com/truck- bodies/article/21262503/rev-group-takes-steps-to-normalcy-after-supply-chain-setbacks (last visited Aug. 15, 2025).

[55] Musharbash, *supra* note 1.

[56] *Id.*; CHRIS GODFREY, AN EVALUATION OF FIRE APPARATUS USAGE AND OPERATING COST FOR GREEN TOWNSHIP FIRE & EMS at 9 (Aug. 2, 2013), http://www.ohiofirechiefs.com/aws/ OFCA/asset_manager/get_file/77188 (last visited Aug. 15, 2025); Patrick Varine, *Despite Grant, PA Dept. Says Rising Apparatus Costs a Challenge*, FIREHOUSE (Aug. 3, 2023), https://www.firehouse.com/apparatus/news/53068052/despite-fire-act-grant-export-pa-fire-department-says-rising-fire-apparatus-costs-a-challenge (last visited Aug. 15, 2025).

[57] Musharbash, *supra* note 1.

[58] CHRIS GODFREY, AN EVALUATION OF FIRE APPARATUS USAGE AND OPERATING COST FOR GREEN TOWNSHIP FIRE & EMS at 9 (Aug. 2, 2013), http://www.ohiofirechiefs.com/aws/OFCA/ asset_manager/get_file/77188 (last visited Aug. 15, 2025); Baker, Farrell & Kovaleski, *supra* note 34; Jody Godoy, *As Fire*

industry has "reached a new level of price psychology. Today, relationships start at a half million dollars, and 10 years ago that was a remote concept."[59]

101.    Nor is seeking out competition a viable option for customers looking to get a better deal on fire apparatus. As one industry executive has observed, "[t]here are now times when all vendors at a bid table, each with a 'different' product, are all owned and managed by the same parent company. How is that competitive for the purchaser?"[60] Fire departments across the country have little alternative than to pay the exorbitant prices Manufacturer Conspirators are charging for their Fire Trucks.

### 4.    Manufacturer Conspirators used "floating prices" to raise prices.

102.    On top of already high base prices for new fire trucks, REV Group, Oshkosh, and Rosenbauer have relied on the significant industry backlog to justify imposing "floating prices" on their customers. Using the purported difficulty of projecting material costs over a years-long lead time as an excuse, Manufacturer Conspirators have added price clauses to their contracts that allow Manufacturer Conspirators to increase the final price of a fire truck after it goes into production. Due to production delays, this means Manufacturer Conspirators can increase their prices years after a fire department initially

*Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe*, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/fire-truck-prices-hit-2-million-us-firefighters-demand-an-antitrust-probe-2025-05-13 (last visited Aug. 15, 2025); Musharbash, *supra* note1.

[59] Chris Mc Loone, *Fire Industry Outlook: 10 Years After the Great Recession*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Dec. 1, 2018), https://www.fireapparatusmagazine.com/fire-apparatus/fire-industry-outlook-10-years-after-the-great-recession (last visited Aug. 15, 2025).

[60] Musharbash, *supra* note 1.

orders a truck.[61] Mark Fusco, the president of Rosenbauer America, has conceded that his company imposes "surcharges that might occur during the build times" on Rosenbauer customers.[62]

103.   One fire department in Massachusetts ordered a fire truck in 2022 and then added two more trucks to their original order in 2023. After the second order, the fire truck manufacturer increased the price of the truck ordered in 2022 by $150,000 to match the price of the trucks ordered in 2023. The manufacturer threatened not to deliver the truck ordered in 2022 unless the fire department agreed to the price increase. The fire chief felt "compelled to pay this increase out of fear that the process to get apparatus would take too long and we would not be able to provide service to our community."[63]

104.   As another example, a fire department in Indiana was hit with a more than $100,000 price increase for the same pumper truck after a 7-month delay.[64] And in yet a third example, the Loveland Fire Rescue Authority in Colorado experienced a surcharge of $29,000 on a pending order.[65]

---

[61] Press Release, Sen. Jim Banks, Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing, https://www.banks.senate.gov/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing(last visited Aug. 15, 2025).
[62] Ed Ballam, *2022 Was Good for Fire Service Industry; 2023 Is Uncertain*, FIRE APPARATUS & EMERGENCY EQUIPMENT  (Dec.  20,  2022), https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain (last visited Aug. 15, 2025).
[63] Press Release, Sen. Jim Banks, Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing, https://www.banks.senate.gov/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing (last visited Aug. 15, 2025).
[64] *Id.*
[65] *Floating" Prices & Lengthy Delivery Times for Fire Apparatus CSFC Members' Perspective*,  at  1,

### G.    Defendants and their co-conspirators' conspiracies increased manufacturers' margins and revenues.

105.    Defendants and their co-conspirators (Manufacturer Conspirators) have reaped the profits of these price increases. In July 2021, REV Group announced that it had "[e]xceeded consensus earnings estimates for five consecutive quarters."[66] In 2024, REV Group's profit margins jumped to what the company described as an "exceptional 8.9 percent" for the division that includes fire trucks.[67]

106.    In June 2025, Oshkosh stated that its adjusted operating margins had grown from 4.8% to 10.5% from 2022 to 2024, delivering on "key 2022 Investor Day targets one year early."[68]



*Oshkosh's financial performance, 2022 to 2024.*[69]

---

https://static1.squarespace.com/static/5ea64a6b9614427b0ff93e6d/t/63080a517f782438bdd6f98e/1661471313934/Floating+Prices+Lenghty+Delivery+Time+for+Fire+Apparatus+Aug+25+20 22%5B42%5D.pdf (last visited Aug. 15, 2025).

[66] *REV Group, Inc. Presentation*, REV GROUP at 4 (July 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf (last visited Aug. 15, 2025).

[67] Baker, Farrell & Kovaleski, *supra* note 34.

[68] *REV Group, Inc. Presentation*, REV GROUP at 4 (July 2021), https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf (last visited Aug. 15, 2025).

[69] *Id.*

107.   Oshkosh anticipates its adjusted operating margins will grow to 12 or 14 percent by 2028, with revenue of $13-14 billion.[70] According to the company, that revenue growth will be "supported by strong backlog" and price increases.[71]

108.   With a few exceptions during the pandemic years, overall revenues for fire truck manufacturers in the U.S., including Manufacturer Conspirators, have increased significantly since 2015.



*Fire Truck Manufacturing Revenue in the United States.[72]*

---

[70] *Id.* at 86.

[71] *Id.* at 87.

[72] Oliwier Samorajski, *Fire Truck Manufacturing in the US – Market Research Report (2015-2030)* , IBIS WORLD (Apr. 2025), https://www.ibisworld.com/united-states/industry/fire-truck-manufacturing/5645 (last visited Aug. 15, 2025).

**H.     Plaintiff-Specific Facts**

109.    The Shawnee Fire Department is a full-service municipal fire department providing fire suppression, advanced life support emergency medical services, rescue operations, hazardous materials response, and fire prevention services. For calendar year 2025, the Shawnee Fire Department responded to 5,645 emergency calls for service, including calls for emergency medical services, structure fires, vehicle accidents with extrication, hazardous materials incidents, and other public safety emergencies.

110.    The Shawnee Fire Department operates three (3) fire stations strategically located throughout Shawnee to ensure timely response to residential, commercial, and industrial areas. Also, the Shawnee Fire Department maintains and operates fire apparatuses, including fire engines and aerial apparatuses essential for structural firefighting, rescue operations, and emergency response functions.

   a.  Station 1 houses one Engine Company and one Truck Company.

   b.  Station 2 houses one Engine Company.

   c.  Station 3 houses one Engine Company.

111.    Modern fire and emergency response operations require increasingly specialized training and equipment. Shawnee Fire Department personnel are trained in:

   a.  Advanced/Basic life support emergency medical care,

   b.  Hazardous materials response,

   c.  Technical rescue operations,

   d.  Flood and Swift water rescue operations,

   e.  Vehicle extrication,

37

f.  Wildland firefighting, and

g.  Incident command.

112.  As construction methods evolve, vehicle technology advances, and hazardous materials incidents become more complex. Consequently, Shawnee Fire Department's reliance on properly equipped and maintained fire apparatus and specialized equipment has increased significantly.

113.  Reliable fire apparatus and associated equipment are critical to ensuring firefighter safety and maintaining the Shawnee Fire Department's ability to protect life and property within the City of Shawnee.

114.  The City of Shawnee has had financial dealings with Conrad, Oshkosh, and Pierce to obtain fire trucks and apparatuses. The Shawnee Fire Department has purchased the following fire apparatuses from OshKosh through transactions partially facilitated by Conrad:

a.  A 2018 Pierce PUC Custom Pumper for $657,102.00,

b.  A 2018 Pierce Ascendant 107' Aerial Ladder Truck for $997,343.00,

c.  Ordered a Ford Skeeter Rescue in February 2025 for $323,867.99 (still waiting on this truck)

d.  Ordered a Pierce Custom Pumper in October 2022 for $855,880.08 (The order was canceled in July 2025 for failure to meet the delivery deadline.)

**ANTITRUST INJURY**

115.  Defendants' anticompetitive conduct had the following effects, among others:

- price competition has been restrained or eliminated with respect to fire trucks

38

and components;

- the prices of fire trucks and components have been fixed, raised, stabilized, or maintained at artificially inflated levels;

- Plaintiff has been deprived of free and open competition; and

- Plaintiff has paid artificially inflated prices for fire trucks components, causing substantial harm to Plaintiff.

116. The purpose of Defendants' conspiratorial conduct was to raise, fix, or maintain the price of fire trucks and components. As a direct and foreseeable result, Plaintiff paid supra-competitive prices for fire trucks and components during the relevant period.

117. By reason of the alleged violations of the antitrust laws, Plaintiff has been injured because they paid higher prices for fire trucks and components than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy. This is an injury of the type that the antitrust laws were meant to punish and prevent.

## A.   Market Power and Barriers to Entry

### 1.   Relevant Markets

118. One tool that courts use to assess the competitive effects of concerted action is defining the relevant market. The relevant market is the zone of competition among agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). Here, the product market is all fire trucks, and the geographic market is Oklahoma.

## 2.    The product market encompasses all Fire Trucks.

119.    This case concerns fire trucks as recognized by the National Fire Protection Association ("NFPA") Standard 1900 regarding automotive fire apparatus and the National Wildfire Coordinating Group Standards for Wildland Fire Resource Typing (together, the "Standards"). These standards classify fire trucks within the United States into seven types, all of which are at issue in this case:[73]

- **Type 1** Fire Trucks are often referred to as an engine company, engine pumper, or structural firefighting truck. This is the most common type of fire truck in use today. Urban, suburban, and rural fire departments all rely on Type 1 fire trucks. Type 1 Fire Trucks carry all required NFPA firefighting equipment and support both structural firefighting and initial emergency medical services. Every Type 1 Fire Truck is required to have a pump with a minimum tank size of 300 gallons and to be equipped with 2.5-and 1.5-inch hoses of varying lengths. These trucks must also include a full complement of ground ladders, nozzles, forcible entry equipment, rear access and egress, and some level of first aid equipment. They are designed to carry four firefighters.

- **Type 2** Fire Trucks carry all required NFPA firefighting equipment and support both structural firefighting and initial emergency medical services. They are most commonly used in urban and suburban settings. They typically carry three to four firefighters.

---

[73] Types of Fire Trucks: An Overview and Comparison, PIERCE (Nov. 14, 2023), https://www.piercemfg.com/pierce/blog/types-of-fire-trucks (last visited Aug. 15, 2025).

- **Type 3** Fire Trucks are often referred to as a wildland Fire Truck or a brush truck. They are typically used in rural and wildland settings. NFPA standards require a Type 3 engine to have a minimum of a 500-gallon water tank and a pump capable of a minimum of 150 US gallons per minute at a pressure of 250 pounds per square inch. Many Type 3 fire engines also feature an auxiliary pump in addition to the main water pump. The auxiliary pump can be powered by a separate diesel engine that is connected to the pump. This pump-and-roll technique means that a truck operator can drive the truck while crew members man the pump and hoses, allowing firefighters to follow along as forest fires and brush fires move with the weather, and to create fire lines, wetting down areas ahead of an advancing wildfire. Type 3 Fire Engines must be equipped to carry at least three passengers.

- **Type 4** Fire Trucks, like Type 3 trucks, are often used in wildland firefighting. Compared to Type 3 trucks, Type 4 trucks have a larger water tank and reduced hose capacity requirements. Type 4 Fire Trucks must have a 750-gallon water tank that offers 50 gallons per minute of water transfer at a pressure of 100 pounds per square inch. Type 4 trucks must be equipped to carry at least two people.

- **Types 5, 6, and 7** Fire Trucks are often grouped together because they feature many of the same design qualities. These vehicles are typically pick-up truck-based with 4-wheel drive on a medium duty chassis. The main difference between Type 5, Type 6, and Type 7 Fire Trucks is the difference in their

maximum gross vehicle weight rating ("GVWR"):

**Type 5** trucks have a maximum GVWR of 26,000 pounds; Type 6 trucks have a maximum GVWR of 19,500 pounds, and Type 7 trucks have a maximum GVWR of 14,000 pounds. Type 5, 6, and 7 trucks typically carry a 300-gallon water tank and a small booster pump with a minimum capacity of 50 gallons per minute. They must be equipped to carry two firefighters.



| SPECS | TYPE 1 | TYPE 2 | TYPE 3 | TYPE 4 | TYPE 5 | TYPE 6 | TYPE 7 |
|---|---|---|---|---|---|---|---|
| | STRUCTURE | | WILDLAND BRUSH TRUCKS | | | | |
| TANK MIN. CAPACITY (GAL) | 300 | 300 | 500 | 750 | 400 | 150 | 50 |
| PUMP MIN. FLOW (GPM) | 1000 | 500 | 150 | 50 | 50 | 50 | 10 |
| @ RATED PRESSURE (PSI) | 150 | 150 | 250 | 100 | 100 | 100 | 100 |
| HOSE 2½" (MIN. FT) | 1200 | 1000 | ✕ | ✕ | ✕ | ✕ | ✕ |
| HOSE 1½" (MIN. FT) | 500 | 500 | 1000 | 300 | 300 | 300 | ✕ |
| HOSE 1" (MIN. FT) | ✕ | ✕ | 500 | 300 | 300 | 300 | 200 |
| LADDERS | ✔ | ✔ | ✕ | ✕ | ✕ | ✕ | ✕ |
| PUMP AND ROLL | ✕ | ✕ | ✔ | ✔ | ✔ | ✔ | ✔ |
| MAX. GVWR (LBS) | ✕ | ✕ | ✕ | ✕ | 26,000 | 19,500 | 14,000 |
| PERSONNEL (MIN.) | 4 | 3 | 3 | 2 | 2 | 2 | 2 |
| TYPICAL USES | STRUCTURAL FIRE RESPONSE | STRUCTURAL FIRE RESPONSE | BRUSH FIRE RESPONSE | BRUSH FIRE RESPONSE | INITIAL ATTACK, BRUSH PATROL | INITIAL ATTACK, BRUSH PATROL | PATROL, MOP UP, INITIAL ATTACK |

✔ REQUIRED  ✕ NOT REQUIRED/OPTIONAL

*Firetruck types and specifications.*[74]

---

[74] BOISE MOBILE EQUIPMENT, *Types of Fire Trucks and Their Purpose* (Feb. 21, 2022), https://www.bmefire.com/types-of-fire-trucks (last visited Aug. 15, 2025).

120.   Some trucks are specially equipped to conform to additional standards. For example, NFPA Chapter 5 describes the requirement for a truck to be considered a Pumper Fire Apparatus, NFPA Chapter 9 describes the requirements for a Quint Fire Apparatus, NFPA Chapter 11 describes the requirements for a Mobile Foam Fire Apparatus, and NFPA Chapter 19 describes the requirements for Aerial Fire Apparatus (which include trucks equipped with aerial ladders, elevating platforms or towers, and water tower devices).[75] These specialty trucks are also included in the relevant product market.

### 3.   The geographic market is Oklahoma.

121.   As described above, all three Manufacturer Conspirators sell fire trucks and components across the 50 states. The relevant market in this action is Oklahoma, which encompasses the sovereign territories of several Native American Tribes.

### a.   Conspirators, including Defendant Conrad, have market power in the relevant market.

122.   As a result of industry roll-ups from the mid-2010s through today, the overwhelming majority of the fire truck industry's sales and capacity are now concentrated among three dominant manufacturers: REV Group, Oshkosh, and Rosenbauer. As described above, REV Group captures around $1 billion of annual fire truck sales made in the United States, Oshkosh captures around $750 million, and Rosenbauer captures around $307 million. In combination, these three companies capture between 70 and 80 percent of the

---

[75] PIERCE, *Types of Aerial Fire Trucks: NFPA Classification Overview* (Nov. 8, 2022), https://www.piercemfg.com/pierce/blog/types-of-aerial-fire-truck (last visited Aug. 15, 2025).

national market.[76]

### b.    The barriers to entry protect Conspirators' market shares.

123.    Fire trucks are expensive, made-to-order, specialty equipment. End-users can specify nearly every aspect of the apparatus they order, from the size of the motor, to the placement of emergency lights, to the location of equipment storage compartments.

124.    This demand for customization stems from the diversity of department location and size throughout the United States and Oklahoma fire department community. There are approximately 52,000 fire stations across the country with each fire department, and sometimes each fire station, having its own specific set of requirements.[77] [78]

125.    Given this backdrop, breaking into the Fire Truck industry is challenging. The cost of producing Fire Trucks, combined with the long lead times, mean that only well-funded, established corporations have much chance of sustaining themselves through the initial investment period. The large capital outlays required limit market entry, as it can be difficult for firms to raise the required funds.

126.    The specialized nature of the Fire Truck market is an additional barrier to entry. The niche engineering expertise needed to meet NFPA standards and fire departments' demands is largely confined to current manufacturers. The effort required to develop the necessary expertise is another deterrent to would-be competitors.

---

[76] Baker, Farrell & Kovaleski, *supra* note 34.

[77] *Id.*

[78] FULD & CO., *What a Competitive Strategy Analyst Thinks About the Fire Apparatus Industry*, https://www.fuld.com/what-a-competitive-strategy-analyst-thinks-about-the-fire-apparatus-industry (last visited Aug. 15, 2025).

### c.     The conspiracy has harmed Plaintiff.

### i.     Plaintiff overpaid for Fire Trucks.

127.   If the price of Fire Trucks had increased only at the rate of inflation between 2015 and 2025, pumper trucks would cost approximately $680,000 (rather than the current cost of $1 million), and ladder trucks would cost approximately $1.2 million (rather than $2 million).[79] Municipalities across the country, including the City of Shawnee are therefore paying approximately 47 percent (or $320,000) more for pumpers and 66 percent (or $800,000) more for ladder trucks in 2025 than would be expected based on inflationary costs alone.

128.   There are approximately 5,000 new Fire Trucks sold in the United States every year.[80] Of these, about 75% are pumpers.[81] That means that since 2016, Plaintiff has contributed to a combined total of approximately $56.25 billion for new Fire Trucks[82]— $19.8 billion more than expected based on increased inflation alone.[83]

---

[79] Calculated assuming a pumper cost $500,000 and a ladder truck cost $900,000 in 2015.

[80] Jeffrey Bonior, *Get to Know Sutphen, Which Has Been Making Fire Engines in the United States Since 1890*, SUTPHEN (Mar. 12, 2021), https://www.sutphen.com/get-to-know-sutphen-which-has-been-  making-fire-engines-in-the-united-states-since-1890 (last visited Aug. 15, 2025).

[81] Alan M. Petrillo, *What's the Right Size Pump for Your Apparatus and How Does It Affect the Design?*, FIRE APPARATUS & EMERGENCY EQUIPMENT (Sept. 27, 2023), https://www.fireapparatusmagazine.com/fire-apparatus/pumpers/whats-the-right-size-pump-for-your-apparatus-and-how-does-it-affect-the-design (last visited Aug. 15, 2025).

[82] Calculated as ((3,750 pumper trucks per year * 9 years *$1 million) + (1,250 ladder trucks per year * 9 years * $2 million)).

[83] Cost based on inflation alone ($36.45 billion) calculated as ((3,750 pumper trucks per year * 9 years *$680,000) + (1,250 ladder trucks per year * 9 years * $1.2 million)).

129.    Even accounting for issues facing the Fire Truck market in terms of supply chain and labor shortage challenges, these increases are far beyond what would be expected in a competitive market.

> ii.  **Inflated prices and long backlogs have prevented Plaintiff from timely replacing old vehicles in its Fire Truck fleets, and its fleets have suffered as a consequence.**

130.    As fire vehicles age, they become prone to more frequent and serious breakdowns, leading to more costly repairs and prolonged downtime. The National Fire Protection Association recommends that apparatuses should be moved from the frontlines to the reserve fleet after 15 years and removed from service completely at the 20- or 25-year mark.

131.    Skyrocketing prices and longer delivery times have made it difficult for municipalities to replace aging vehicles in their fire departments' fleets in a timely manner. In many cases, fire departments are operating using trucks that have exceeded their service life because buying new trucks is prohibitively expensive. According to the president of the International Association of Fire Fighters, Edward Kelly, cities and towns across the country are facing a crisis where demand for new Fire Trucks has outstripped availability and funding.[84]

---

[84] Jody Godoy, *As Fire Truck Prices Hit $2 Million, US Firefighters Demand an Antitrust Probe*, REUTERS (May 13, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/fire-truck-prices-hit-2-million-us-firefighters-demand-an-antitrust-probe-2025-05-13 (last visited Aug. 15, 2025).

### iii. Reduced Fire Truck fleets are less able to respond to disasters.

132. High prices and long waits for fire apparatus are endangering public safety in communities across the country, particularly those facing natural disasters, such as Oklahomans hit by Rattlesnake Fire, Hospital Road Fire, 43 Fire, Stevens Fire, Range Road Fire in February 2026 alone.

### B. Defendants, and their co-conspirators concealed the conspiracy and Plaintiff could not have discovered it.

133. Plaintiff had neither actual nor constructive knowledge of the facts constituting its claim for relief. Plaintiff did not discover and could not have discovered, through the exercise of reasonable diligence, the existence of the conspiracy until shortly before filing this Complaint. Defendants, and their co-conspirators, engaged in a secret conspiracy that did not reveal facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the price of fire trucks and components. Throughout the relevant period, Defendants, and their co-conspirators, effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff.

134. Defendants and their co-conspirators, the Manufacturer Conspirators, concealed their conspiracy by communicating competitively sensitive information to one another through FAMA Statistical Reports that are unavailable to the public. They also attended members-only discussions during twice-annual FAMA meetings, allowing the existence of written records. Because the public had no access to either the FAMA Reports or the FAMA members-only meetings, there was no reason for Plaintiff to suspect that Defendants were engaged in an unlawful anticompetitive scheme.

47

135.   What's more, Defendants' and their co-conspirators' anticompetitive conspiracy, by its very nature, was inherently self-concealing. Fire trucks are not exempt from antitrust regulation.

136.   By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff has as a result of the unlawful conspiracy alleged in this Complaint.

## COUNT I

### Violation of the Oklahoma Antitrust Reform Act, 79 O.S. § 201, *et seq.*

137.   Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

138.   Defendants were at all times engaged in trade and commerce within the State of Oklahoma.

139.   Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016, and continuing through the present, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize price of fire trucks and components in the State of Oklahoma.

140.   In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants achieved the following conspiratorial outcomes:

- Fixing, raising, and stabilizing the price of fire trucks and components; and

- Allocating among themselves and collusively reducing the production of fire trucks and components.

141.    The combination and conspiracy alleged herein has had the following effects, among others:

- Price competition has been restrained or eliminated with respect to fire trucks and components;

- The production of fire trucks and components has been restrained at artificially low levels;

- The price of fire trucks and components has been fixed, raised, stabilized, or maintained at artificially inflated levels;

- Plaintiff has been deprived of free and open competition; and

- Plaintiff has paid artificially inflated prices for fire trucks and components, causing substantial harm to Plaintiff.

142.    The acts alleged in the Complaint constitute violations of the Oklahoma Antitrust Reform Act, 79 O.S. §§ 201, *et seq.*

143.    The acts alleged in the Complaint constitute unlawful monopolization of a part of trade of commerce in the State of Oklahoma.

144.    As set forth herein, Defendants' anticompetitive conduct with co-conspirators constitutes an unreasonable restraint of trade in or has substantially affected commerce in the State of Oklahoma.

145.    Defendants' anticompetitive conduct has caused unreasonable restraints in the Fire Truck market in the State of Oklahoma.

146.    Plaintiff has been injured and will continue to be injured by paying more for fire trucks and components than they would have paid and will pay in the absence of the

combination and conspiracy.

147.    As a result of Defendants' unlawful conduct, Plaintiff has been harmed by paying inflated and fixed prices for fire trucks and components.

148.    Plaintiff seeks relief under the Oklahoma Antitrust Reform Act, 79 O.S. §§ 201, *et seq.*, including, without limitation, the following:

      **a.**  Injunctive and other equitable relief pursuant to 79 O.S. § 205;

      **b.**  Disgorgement and restitution pursuant to 79 O.S. § 205;

      **c.**  Threefold damages pursuance to 79 O.S. § 205;

      **d.**  Costs and attorneys' fees pursuant to 79 O.S. § 205; and

      **e.**  Other remedies as the Court may deem appropriate under the facts and circumstances of the case.

## COUNT II
## Unjust Enrichment

149.    Plaintiff incorporates and realleges, as though fully set forth herein each and every allegation as set forth in the preceding paragraphs of this Complaint.

150.    As a result of Defendants' unlawful conduct, Defendants have and will continue to be unjustly enriched from their conspiracy to increase prices and stifle production.

151.    Defendants should not be entitled to retain the benefits of their unlawful behavior resulting in overpayments to Plaintiff.  Defendants should be disgorged of the profits obtained from their unlawful behavior.

50

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable.

DATED: April 14, 2026                    Respectfully submitted,

                                         By:    s/*Matthew J. Sill*
                                         Matthew J. Sill (OBA #21547)
                                         Email: msill@fulmersill.com
                                         **FULMER SILL, PLLC**
                                         14005 N. Eastern Ave
                                         Edmond, OK 73013
                                         Phone: (405) 509-6300
                                         Fax: (800) 978-1345

                                         *Attorney for Plaintiff, City of Shawnee,*
                                         *Oklahoma*